BLUE SHIELD OF MARYLAND, INC. ET AL. *v.* THE
WARD MACHINERY COMPANY ET AL.

\* \* \*

BLUE CROSS OF MARYLAND, INC. *v.* INSURANCE
COMMISSIONER OF MARYLAND

|No. 1297, September Term, 1980.|

*Decided July 8, 1981.*

The cause was argued before GILBERT, C. J., and THOMPSON and MOORE, JJ.

*William M. Hesson, Jr.,* with whom were *William P. Englehart,* and *Nolan, Plumhoff & Williams* on the brief, for appellant Blue Shield of Maryland, Inc. *Fred M. Gloth,* with whom was *John A. Picciotto* on the brief, for appellant Blue Cross of Maryland, Inc. *Stephen H. Sachs, Attorney General, Alan B. Lipson* and *Patrick C. Smith, Assistant Attorneys General,* on the brief, for appellant Insurance Commissioner in Blue Shield of Maryland, Inc. et al.

*David A. Wilson* for appellee Ward Machinery Company. *Michael L. Cohen, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Alan B. Lipson, Assistant Attorney General,* on the brief, for appellee Insurance Commissioner in Blue Cross of Maryland, Inc.

THOMPSON, J., delivered the opinion of the Court.

This case presents two appeals from an order of the Baltimore City Court which affirmed in part and reversed in part an order of the Insurance Commissioner of the State of Maryland, directing Blue Cross of Maryland, Inc. and Blue Shield of Maryland, Inc. to distribute to their group subscribers $3,050,000 which had been accumulated during 1979 as surplus reserves. In the first appeal, Blue Cross is the appellant and the Insurance Commissioner is the appellee; the issue presented is the propriety of the Commis-

sioner's order directing distribution. In the second, Blue Cross, Blue Shield and the Commissioner are the appellants and the Ward Machinery Company (Ward) is the appellee; at issue is which group subscribers are to share in the distribution, if it occurs.

Md. Ann. Code, Art. 48A, § 355 (b) (6) (1957, 1979 Repl. Vol., 1980 Cum. Supp.) provides that nonprofit health service plans, such as Blue Cross and Blue Shield,

> "[S]hall maintain a minimum reserve equal to at least 3% of the subscription charges earned during the prior calendar year as shown on the annual statement filed in the office of the Commissioner. If the Commissioner determines after a hearing that the reserves are excessive in amount, he may order the corporation to submit a plan for distribution of the excess in a fair and equitable method, or in the event the corporation fails to submit such a plan within 60 days, he may compile a plan and order the corporation to implement it. Reserves equal to 2 months of the nonprofit health service plan's prior calendar year's claims and operating expenses shall be considered reasonable provided they are in excess of minimum reserve requirements."

On April 11, 1980, Blue Cross and Blue Shield advised the Commissioner that, during 1979, they had accumulated reserves in excess of those required by law and presented a plan for the distribution of the surplus to their subscribers. Because of underwriting losses projected for 1980, which the companies claimed would extirpate the surplus before the end of the year, Blue Cross and Blue Shield proposed that the distribution be contingent upon the non-occurrence of the projected losses, i.e., if the reserves declined as expected, there would no distribution. Under the Blue Cross-Blue Shield proposal, if distribution did occur, the refunds would be made to the 1979 subscribers who had contributed to the surplus, provided that they had re-enrolled for 1980. A public hearing was held on the proposals on May 19, 1980. Ward, which had been a subscriber in 1979 but which had not

re-enrolled in 1980, appeared at the hearing and opposed that portion of the plan which restricted refunds to 1980 subscribers; it argued that it was unfair to deny it a share in the surplus, to which it had contributed, because it had not re-enrolled. On June 12, 1980, the Commissioner rejected the proposed contingent distribution and ordered an immediate refund of $3,050,000; however, he accepted as not unreasonable that portion of the plan which limited participation in the distribution to current Blue Cross-Blue Shield subscribers. Blue Cross appealed to the Baltimore City Court from the order directing distribution and Ward appealed from the order that limited participation to current subscribers. The court below dismissed Blue Cross' appeal, upholding the distribution order, but reversed that portion of the Commissioner's order which limited participation, ordering that all 1979 group subscribers who contributed to the surplus share in its distribution, regardless of whether they had re-enrolled in 1980. Appeals to this Court followed.

I

Blue Cross argues that the court below erred in affirming the Commissioner's order requiring distribution of the surplus reserves because it "ignored" evidence that the company's reserves would be reduced by losses in 1980 to less than the two month level referred to in Art. 48A, § 355 (b) (6). We believe that the court below adequately and correctly disposed of this contention in its opinion, where it stated as follows:

> "Blue Cross appeals from that part of the Commissioner's order requiring it to refund $3,050,000 from its surplus reserves to certain group subscribers. In March, 1980 Blue Cross had submitted to the Commissioner a refund plan of $2,700,000 contingent upon favorable underwriting experience during the first six months of 1980, but at the 5/19/80 administrative hearing, it argued

that the refund plan should be rejected or delayed because of underwriting losses during the first three months of 1980. Md. Code, Article 48A, Sec. 355 (b) (6) requires nonprofit health service insurers (such as Blue Cross) to maintain a 'minimum reserve equal to at least 3% of the subscription charges earned during the prior calendar year'; if the Commissioner determines after a hearing that the reserves are 'excessive', he can order the insurer to submit a distribution plan for the excess 'in a fair and equitable method,' or he can order a distribution plan himself if the insurer fails to submit one; reserves 'equal to two months of the nonprofit health service plan's prior calendar year's claims and operating expenses shall be considered reasonable provided they are in excess of minimum reserve requirements.' The $3 million plus refund ordered by the Commissioner in June, 1980 would still leave Blue Cross with reserves complying with the 3% of subscription charges requirement as well as the two months of the prior year's claims and expenses requirement (which is about 16% of subscription charges).

"Blue Cross presented evidence to show that if its first quarter experience in 1980 remained consistent through the rest of the year, then its reserves at the end of *1980* would be below the two month claims and expense figure for 1980. From this, Blue Cross contends that the Commissioner was wrong in ordering the refund now, since that would require a rate increase by the end of 1980.

"Sec. 355 (b) (6), however, does not mandate that the insurer's reserves at all times be at least equal to the two month claim and expense figure. All the statute requires is that the reserves remaining after the refund be at least equal to the two month claim and expense figure as of the end of the year *preceding* the refund. The 3% of subscription charge figure must always be maintained, but that is not

true of the two month figure. Sec. 355 (b) (6) contemplates a cut-off date for determining the propriety of a refund of an excess surplus, which in this case was the end of calendar 1979. As of that time, excess surplus reserves existed to warrant a refund. The Commissioner can consider projected losses in 1980 in determining whether to order a refund based on 1979 figures, but he is not required to do so. Therefore, the Commissioner's order did not place Blue Cross below the mandated minimums of Sec. 355 (b) (6). (Blue Cross concedes that the 3% reserve requirement is not jeopardized by the refund order.)

"Whether it was prudent for the Commissioner to order the refund of excessive surplus in light of Blue Cross' pessimistic projections for 1980 is not reviewable on this appeal, since the Court may not substitute its judgment for that of the Commissioner who acted within the statutory standards. *Md. Fire UW v. Insur. Comm'r.*, 260 Md. 258 (1971). In any event, the Commissioner found that Blue Cross' testimony as to the possible deterioration of its surplus position in 1980 was not sufficiently convincing to require withholding the proposed refund. This conclusion is amply supported by the evidence, since (i) a Blue Cross witness testified that the first quarter underwriting loss is usually greater than that for the second quarter; and (ii) Blue Cross' investment earnings more than offset its underwriting loss in the first quarter, which **resulted in a net *increase* in Blue Cross' surplus** position for the first quarter of 1980. The net effect of this evidence is that the Commissioner could reasonably conclude that Blue Cross would be able to meet the two month surplus figure by the end of 1980 (a result not mandated by law) or come close enough to it so as not to deter a refund. There was sufficient evidence to justify the Commissioner's rejection of Blue Cross' Doomsday predictions."

Blue Cross also asserts that the court below erred in affirming the Commissioner's order because the Commissioner did not comply with the procedure required under Art. 48A, § 355 (b) (6), which provides that: "If the Commissioner determines after a hearing that the reserves are excessive in amount, he may order a corporation to submit a plan for distribution of the excess . . . ." The Company's objection is that, while a hearing was held by the Commissioner, consideration was allegedly given only to the question of whether the distribution should be immediate or deferred and not to the question of whether reserves were or were not excessive. We are satisfied that the issue as to excessive reserves was properly determined by the Commissioner. Blue Cross had but one argument to make in support of its proposition that its concededly excessive reserves should not be immediately distributed, i.e., that the surplus could be expected to be diminished by year's end. The Commissioner held a hearing, considered the argument, and rejected it. There is ample evidence in the record to support the Commissioner's determination that the amount of the surplus was $3,050,000. We see no error.

## II

In the second appeal, Blue Cross, Blue Shield, and the Commissioner seek reversal of that portion of the lower court's order which held in favor of Ward and directed that 1979 subscribers who had contributed to the surplus were to be included in the distribution regardless of whether they had enrolled in 1980. Their initial argument is that Ward had no right to appeal the decision of the Commissioner.

Md. Ann. Code Art. 48A, § 361B provides that judicial review of decisions by the Commissioner involving nonprofit health insurance organizations shall be in accordance with Art. 48A, § 242B, which provides as follows:

"(1) *Hearing before Commissioner.* — Any insurer or rating organization aggrieved by any

order or decision of the Commissioner under this subtitle made without a hearing, may within thirty (30) days after notice of the order to the insurer or organization, make written request to the Commissioner for a hearing thereon. The Commissioner shall hear such party or parties within twenty (20) days, after receipt of such request and shall give not less than ten (10) days' written notice of the time and place of the hearing. The hearing shall be concluded within fifteen (15) days from the commencement thereof; provided, however, that the Commissioner, upon application with notice to the interested parties and for good cause shown, may grant additional time, not exceeding fifteen (15) days. Within twenty (20) days after the conclusion of such hearing the Commissioner shall affirm, reverse or modify his previous action, specifying his reason therefor, and shall give a copy of such order or decision to all interested parties. In the event of the Commissioner's failure to hold or complete the hearing or to render his order or decision within the period specified herein, the filing or application in issue shall be deemed to meet the requirements of this subtitle and shall be deemed approved.

"The order shall contain specific findings of fact by the Commissioner in relation to the matter before him, such findings to be supported by a preponderance of the evidence on consideration of the record as a whole. Any party may file with the Commissioner proposed findings of fact, to be accepted or rejected by the Commissioner.

"Pending such hearing and decision thereon the Commissioner may suspend or postpone the effective date of his previous action.

"Nothing contained in this subtitle shall require the observance at any hearing of formal rules of pleading or evidence.

"(2) *Judicial review of decisions of Commissioner.* — All orders or decisions of the Commis-

sioner shall be subject to review by appeal to the Baltimore City Court. Such an appeal shall be commenced by filing a notice of appeal within 30 days after the rendition of such order or decision with such court and a copy of it similarly filed with the Commissioner. If not so commenced, the right to appeal shall no longer exist. The Commissioner shall be made a party to every such appeal.

"Upon filing of a copy of the notice of appeal with the Commissioner he shall prepare or cause to be prepared an official record, which may be in typewritten form, certified by him, which shall contain a copy of all proceedings, the findings and order of the Commissioner, and transcript of any testimony and exhibits or records thereof. If no hearing was held by the Commissioner, on the matter which is the subject of appeal, the Commissioner shall in like manner prepare and certify a transcript of the files in his office pertaining to such matter. Within 30 days after the copy of notice of appeal was filed with the Commissioner he shall file the official record with the court in which the appeal is pending.

"When any ruling, order or decision of the Commissioner relates to an increase or decrease of premiums or rate or to a change in any rating system, the filing of the notice of appeal, pending the final determination of the issue, shall act as a stay of any such ruling, order or decision, except where such ruling, order or decision approves or permits a filing of an insurer or rating organization.

"The Baltimore City Court shall hear and decide the appeal within 60 days after the date of the filing of the notice of appeal, and shall affirm, reverse or modify the Commissioner's order or decision appealed from.

"If the Baltimore City Court finds that the Commissioner's order or decision is not supported by the preponderance of the evidence on consideration of

the record as a whole, or is not in accordance with law, the court shall reverse or modify the Commissioner's order or decision in whole or in part.

"An appeal to the Court of Special Appeals may be taken from the decision of the Baltimore City Court as in other civil cases. The Commissioner shall be made a party to every appeal of this nature.

"(3) *Application of section; certain sections not applicable to rating and rating organizations.* — The provisions of this section shall govern hearings, orders and appeals in matters arising under the provisions of this subtitle. Sections 35, 36, 37, 38, 39 and 40 shall not apply to rating and rating organizations." [1]

Prior to July 1, 1979, Art. 48A, § 361B provided that judicial review of decisions such as that involved here was to be had in accordance with Art. 48A, § 40 which provides for de novo review by the Baltimore City Court and further provides that:

"An appeal from the Commissioner shall be taken only from an order or hearing or with respect to a matter which the Commissioner has refused a hearing. Any person who was a party to such hearing, or whose pecuniary interests are directly and immediately affected by any such order or refusal and who is aggrieved thereby may ... appeal from such order or hearing or such refusal of a hearing."

By Chapter 246, Laws of Maryland 1979, the legislature amended § 361B so as to substitute review under § 242B for that under § 40. The appellants argue that this amendment was intended to restrict the right of appeal to insurance

---

1. The appellants suggest that subsection (1) of this section permits appeal only by an "insurer or rating organization aggrieved." That subsection plainly has nothing to do with judicial review or the issue of who has standing to appeal; it deals only with the question of when and by whom a hearing before the Commissioner may be requested.

organizations. We see no merit in the argument. Subsection (2) of § 242B provides for judicial review of decisions of the Commissioner. There is nothing either expressed or implied in the language of that subsection which would deny Ward's standing to appeal. We hold that Ward, which appeared before the Commissioner at the hearing, which had a clear financial interest in the outcome, and which was aggrieved by the Commissioner's decision, had standing to appeal the decision of the Commissioner under Art. 48A, § 242B (2).[2]

Our finding that Ward had standing to appeal of course does not answer the question of whether the court below erred in reversing the Commissioner. The appellants argue that the court exceeded the proper scope of judicial review and impermissibly substituted its judgment for that of the Commissioner. The Commissioner in determining that the companies' proposal, limiting participation to current subscribers, was not unreasonable, stated:

> "The company's argument is that it should be permitted to share in the refund even though it is not now a subscriber, inasmuch as it contributed during 1979 to the surplus.
>
> "The difficulties with granting this seemingly logical request are two in number. First, it is clear under the law that surplus, once it becomes surplus, does not belong to any particular insured, but belongs to the insurance company and any distribution required cannot be said to be unreasonable so long as the distribution is made to policyholders who are such at the time distribution is made. The Insurance Commissioner is empowered under the Insurance Code only to determine whether the decisions of the insurer are reasonable and not whether he would substitute, as more equitable, his judgment for that of the insurers.

---

2. The preamble to the bill which enacted the amendment indicated that its purpose was to alter the scope of appeal, abolishing the de novo review by the Baltimore City Court, rather than to limit standing to appeal. Although the preamble is not controlling, it may be consulted as an aid in construction of the statute, see, Dillon v. State, 277 Md. 571, 583, 357 A.2d 360 (1976).

"Second, distribution of the surplus in excess of that deemed by me to be reasonable, on the basis outlined by the Ward Machinery Company, would be nearly an administrative impossibility. Each insured's contribution would have to be precisely determined for that period of the year during which the group was a subscriber. Complex formulae would have to be programmed for each insured's relationship to the other, along with exclusion of existing insureds who were not insureds during 1979 or were insureds for only a proportionate part of 1979. To this would be added the problem of turnover of subscriber employees within each group for the year. Given the fact that this would require comparisons among literally thousands of groups, and given the fact that the return for each individual subscriber in each individual group is minuscule, compared with the overall cost of developing such a system as is proposed by the Ward Machinery Company, I conclude the insurer's plan for distribution not to be unreasonable. Further, I have previously approved similar plans submitted by the insurers for previous distributions which were accepted without protest."

The lower court set forth its reasons for reversing the Commissioner's decision as follows:

"The Commissioner justified limiting the eligible recipients to those groups which continued to subscribe in 1980 solely on the basis that to do otherwise 'would be nearly an administrative impossibility.' There is nothing in the record to support this conclusion. The only evidence bearing on this subject is the testimony of one of the witnesses for Blue Cross-Blue Shield that it is more 'expensive' to search the records to determine who was a 1979 subscriber. No evidence was presented to back up this statement. Indeed, even under the plan approved by the Commissioner, a determination of

> those eligible for refunds is no easy matter. The insurer would still have to determine which of its 1980 group subscribers were 1979 subscribers who generated underwriting gains, and the ratio of their contributions to the excessive surplus would have to be calculated. While it is true that the refunds to the current group subscribers could be distributed by a credit against current bills, current subscribers would still have the option of receiving a cash refund. It appears that the only additional time or expense involved in Ward's proposal is trying to locate those 1979 group subscribers who did not renew in 1980. There is no evidence to suggest that this added burden is more than minimal."

Although we agree that there was no substantial evidence to support the Commissioner's finding that there would be undue expense and difficulties in including in the distribution 1979 group subscribers who had not re-enrolled in 1980, we believe the lower court went beyond the proper scope of review. The function of the Commissioner was limited to determining whether the proposed distribution was fair and equitable; the function of the Baltimore City Court was limited to a determination of whether the Commissioner's decision was legal and whether a reasoning mind could have determined that the factual conclusion reached was proven by the weight of the evidence on the record as a whole. *See,* Md. Ann. Code Art. 48A, § 242B (2); *State Insurance Commissioner v. National Bureau of Casualty Underwriters,* 248 Md. 292, 305, 236 A.2d 282 (1967). We think a reasoning mind could determine that the proposed distribution of the insurer's own moneys was equitable. A substantial portion of the funds Ward claims were available because of investment income, that is to say as a result of surpluses created in many different years before 1979. There is nothing in the record extract to show that Ward's contributions for the year 1979 exceeded its claims. That the court, or the Commissioner, could devise a plan which was more equitable is irrelevant. We think the trial judge impermissibly substituted his judgment for that of the Commissioner. *See, State*

*Insurance Commissioner v. National Bureau of Casualty Underwriters, supra.*

Ward argues that, as Art. 48A, § 355 (b) (6) requires distribution "in a fair and equitable method," the Commissioner erred in finding that the companies' plan was "not unreasonable." We believe that this is a distinction without a difference. The Commissioner's meaning was clear; that he did not express it in the language of the statute is of no consequence.

> *Order of the Baltimore City Court reversed in part and affirmed in part in accordance with this opinion.*
>
> *One-half costs to be paid by the Ward Machinery Company and one-half by Blue Cross of Maryland, Inc.*